Yes, thank you, Judge Kristen. May it please the court, my name is Andrew Missel. I represent the point of appellant neighbors of the Mogollon Rim. I've also, my client says Mogollon, I've also heard Mogollon, Mogollon, my client says Mogollon Rim. We need you to present in every possible way this week. Go right ahead. Okay. So I know that there have been a lot of issues raised in this case. So unless the court has any sort of questions right off the bat, I'd like to sort of focus the court's attention on three key issues. The first of those is the alternatives issue. So NEPA requires agencies to consider a reasonable range of alternatives so that they have a meaningful choice among them. And here, NEPA, or the Forest Service violated that by considering two extreme alternatives. One, which greatly increases the amount of grazing on the Bar X and opens this long closed pasture to grazing, and the other, which completely eliminates grazing from the Bar X altogether. My client and many others asked the Forest Service to consider a third alternative, one that would essentially keep the status quo, albeit with whatever changes the Forest Service would want, as long as the Polecorp Turkey pasture, which is the pasture surrounding where my client's members live, would remain closed. The Forest Service gave three reasons during the NEPA process for not considering such an alternative, and none of those reasons holds water, as we discussed in our briefing. The first reason that the Forest Service gave was that it wouldn't meet the purpose and need of the project. But the purpose and need of the project, which is laid out in pages 53 and 54 of the second volume of the excerpts of record, is pretty broad and is clearly about the key word there is considering grazing opportunities. NEPA is a decision-making tool. The Forest Service sensibly has integrated NEPA into its forest management planning process. So the entire purpose of this process was, should we open up this pasture to grazing? It's been closed for about 40 years. Given that, it seems natural that you would want to consider an alternative that looks sort of like what you've been doing for the last 40 years, so you can have a meaningful choice among alternatives, which is what NEPA is supposed to require. Excuse me. What would you like the panel to do? So, Your Honor, we have asked in the briefing for the panel to order the Forest Service to prepare a full EIS and then to vacate the key documents in this case, so the EA, the FONSI, the term grazing permit, the allotment management plan. That's what we've asked for. Of course, I do understand that because the district court ruled against us, it never reached the issue of remedy. And of course, I appreciate that this court has discretion whether to reach those issues or send them back. If you were to agree with some merits, you have discretion to send it back to the district court to decide those matters in the first instance. But we are asking this court to address them. So, you would like us to send it back to district court with instructions for the district court to return it to the agency to further deliberate and come up with more acceptable, realistic, from your point of view, alternatives, correct? So, yes, Your Honor, we would like to see the Forest Service include a third alternative along the lines suggested by my client and others that would keep the cold court turkey pasture close to grazing. And we'd also like the agency to prepare a full EIS rather than an EA. But whether it ends up doing a new EA or EIS, we want that third alternative as part of the analysis. But from your client's point of view, if the pasture is closed to grazing, you'd be happy with it. That's right. That's right. And I think that's why in our reply brief, because it, so we asked for vacature, we asked for full vacature in our opening brief. Excuse me, just humor me for a minute. I have a point here. So, it would be acceptable to that if the agency said, okay, we'll come up with a plan that the pasture you just referred to is not open to grazing. That would satisfy the client. I think that's correct, Your Honor. Yes. Excuse me, Your Honor. I'm sorry. I didn't get that full question. That leads to this question. Well, that leads me to this question. Have the parties considered mediation? Your Honor, we did go through the mandatory, you know, we fill out the mediation form and we filed this notice of appeal. I think we came to the conclusion that that was not going to be a realistic option. I think that the Forest Service wants to include this pasture as part of the grazing scheme on the Bar X. The question is different, counsel. The question is, because you're not here to speak for the client, is willing to try mediation? Yes. But you haven't yet? We, well, so we haven't, we filled out the, you know, when we filed the notice of appeal, we sort of had the preliminary, you know. Counsel, this is a really straightforward question. Filling out a form is not mediating. It's not a trick question. You've told me that your client is willing to mediate. And my question was just, have you mediated? Have you attempted? We haven't had any real serious mediation efforts, no. Thank you. It sounds like without deciding the overall issue, but it sounds to me like your clients have accepted the idea that there will be grazing. Is that right? As long as it's not encroaching on the pasture that you've referred to. Is that right? Your Honor, I think in this, given the specifics of this case, we have focused our arguments on keeping grazing off of that pasture. Yes. So is the answer to my question, yes? Your clients understand that there will be grazing of some kind or form. Let me finish. Of some kind or form going forward. You can't stop grazing, period. Understand? Is that their realization? I think, you know, I think yes. In this, you know, in the context of this particular. Thank you, counsel for the government. What's your position on mediation? You have a separate pair if you don't mind. I don't think you need your materials for this. We're just, are you willing to mediate this? Yes, the government is willing to mediate, Your Honor. Mediation efforts were not successful through the Ninth Circuit's ordinary process. Did you have mediation success or did you just fill out a form? There is a form filled out. An attorney, a different attorney was assigned to this case before me during the mediation process. I don't believe that initial meeting with the mediator was successful. And for that reason, we move forward with the appeal. Thank you for the clarification. Go ahead with your argument. I'm sorry. I just wanted to make that point. And I take it from your client's point of view, they are unwilling to fence out. So, Your Honor, I think the issue is for some members of my client, it's an economics issue, especially with rising costs over the last couple of years of lumber. I think it can't afford to fence out. That's true for at least some members of the communities. I think others may have aesthetic reasons, but... Put cost aside for the moment. Are your clients opposed to the idea of fencing out? I think some are. Some have expressed a desire not to have fencing for aesthetic reasons. I think some would. I think there's a mix. They understand that cattle and sheep have grazed in this area for 150 years? Your Honor, they certainly graze in the general vicinity, but for the last 40 years, there hasn't been cattle grazing in this particular area. They understand that historically, both cattle and sheep have grazed in the barracks? Yes, they understand that there's been grazing. Yes. So, the idea for closing grazing entirely is probably not realistic. I think it's fair to say that would be a much harder argument to make. Thank you for your patience. Go ahead with your argument. Actually, if I could jump in. Where you left off, you had just mentioned the purpose of the action, and I'm not sure that we have... Maybe we might have a disconnect there. I'm looking at the district court's order on page... It's ER8, and he said the purpose of the Forest Service's action, which I understood to be uncontested, but I want to make sure I'm getting this right. To consider the livestock grazing opportunities on public lands where consistent with management objectives, and to authorize livestock grazing in a manner consistent with direction to move ecosystems towards their desired conditions. Is that your understanding of the purpose? Yes, I think that's quoted verbatim from the EA. I do too. I took both halves of that into account, but go right ahead. Your Honor, I think we did. I think the key there is to authorize livestock grazing where consistent with management objectives and forest plan. But the whole purpose of the NEPA process is to figure out whether particular alternatives are going to move the forest towards desired conditions. So to eliminate an alternative ahead of time... Excuse me, excuse me. So you've argued getting back, and I appreciate that response. We're not trying to interrupt you. We have quite a delay for some reason in this audio communication today, so apologize in advance if we seem to be interrupting you. But your first point that you're trying to get to is that you think that the Forest Service didn't consider a sufficient number of alternatives, if I may, and you've described it as sort of an all or nothing approach. What is your best... And I appreciate that your clients wanted a third alternative considered. My question is, what's the strongest authority that you have for the proposition that the Forest Service was required to consider your proposed alternative, please? Yes, Your Honor. And let me just say, there's also a delay on my end, so I apologize if I've run over any of your questions. So I think the best authority is the general proposition, and this is in Bob Marshall Alliance versus Hodel, this is in Center for Biological Diversity versus Bernhardt, that there has to be a meaningful choice among alternatives. So an analogy that I would give to this case is, imagine you're a single-car family, and you're thinking, oh, maybe it'd be nice to have another car, but we have budgetary restrictions, sort of like forest plan objectives, and maybe having a second car won't comply with that. Let's go through a planning process and set up alternatives. It'd be very weird, I think, to set your two alternatives as, alternative one, get a second car, alternative two, get rid of the car we have, and then compare those. In order to have a meaningful choice among alternatives, given that context, you would want to look at, let's keep one car or let's have two cars. I think that context of this case, the fact that there had been grazing on the Bar X, as Judge Hawkins pointed out for a long time, but there hadn't been grazing on the cold-pored turkey pasture, that context suggests that in order to have a meaningful choice going forward, the agency should have compared the preferred alternative to something closer to what they had been doing. All right. Thank you for answering my question. Thank you, Your Honor. I think that's what's in your brief, right? That's essentially the answer in your brief. I believe so, Your Honor. The district court, as you know, found that there wasn't a significant difference between the alternative that your clients proffered and the alternatives that were considered. Do you want to speak to that? Yes, Your Honor. I think there's a huge difference in the sense that under the alternative my clients wanted, the exclusion of the cold-pored pasture from grazing, which was in the prior allotment management plan, would be maintained. So, my clients wanted the new allotment management plan, the new term grazing permit, like the old one, to say no grazing on the cold-pored turkey pasture. Under the preferred alternative, it's open to grazing. Now, that doesn't mean there's going to be grazing every year, but it means that there could be grazing any year. Whereas, under my client's suggested alternative, if the Forest Service wanted to open up that pasture to grazing in the future, it would have to revisit the decision and go through another NEPA process. So, for practical purposes, it's a difference between there could be grazing any year and we know that there's not going to be grazing. So, I think it's a very different alternative, practically speaking and legally speaking. Well, I'm not sure it is, and the district court sure didn't think so. I think the reason the district court didn't think so is because this current status quo, the situation going forward, would still require the Forest Service to make the decision about whether the conditions allow continued grazing consistent with the plan. So, in other words, as you said, some years, perhaps, grazing wouldn't be allowed if the management objectives aren't being achieved. That's true, Your Honor, but there would be no further safeguards on that process. In other words, it would be a decision the Forest Service made administratively. And the allotment management plan would... I mean, really, to me, the simplest way is comparing what the two allotment management plans look like under the two alternatives. One of them says the Coldport turkey pasture is excluded from grazing, and the other says it's open to grazing. Those are two very different worlds, both legally, but also in terms of environmental effects. In one world, you don't have any grazing, so there's none of these sort of social, economic, these effects that we discussed in our briefs. In the other world, you do have grazing, and these effects do occur. So, these are two, I think, very different worlds. It's true that the Forest Service would still, every year, decide, are we going to allow grazing? Are we not going to allow grazing? But it would not be through the same forest planning process. I'm going to just close with this because I'm still not sure that we're communicating, but I'm sure you're going to want to reserve some time. I think the way the district court was looking at this, and you can respond when you come back, but I think the way the district court was looking at this is that one alternative, which is the one you want, is no grazing where your clients live. And the other alternative is there might be grazing where clients live. So, maybe you could speak to that when you come back. I'm assuming you're going to want to reserve this time that's available. Yes, Your Honor. Is that a yes? Yes. Okay. That'll be just fine. We'll hear from the opposing counsel, please. Is it correct, counsel, to say that the alternative that the agency proposes is either, A, full on grazing, or B, no grazing at all? It is correct, Your Honor. There's one proposed action considered here, which studies grazing across all possible pastures within the project area. And there's one no action alternative, which studies no grazing on any of the pastures within the project area. And plaintiff's asking for a preferred middle ground alternative here, but that middle ground alternative is encompassed within the range of alternatives already studied. Plaintiff's essentially asking for different piecemeal combinations in the Bar X as a whole. But those effects, the environmental effects of grazing or not grazing, are already captured by these two different alternatives. Because? They're captured because we've already studied the effects of grazing or not grazing across all pastures on the Bar X. So, the middle ground alternative is not significantly distinguishable from that range. Another way to view this, Your Honor, is the adaptive management options encompassed within the proposed action. The Forest Service has discretion within the proposed action, as the district court found, to authorize grazing on different pastures, to adjust this flexible dynamic approach, to shift grazing in order to meet utilization thresholds. Counsel, can I stop you there? Because this is the problem. I think this is the disconnect. In response to Judge Hawkins' question, you said, yes, that's correct. It's an all or nothing, right? But now, you seem to be getting around to acknowledging where I left off with opposing counsel, right? It seems to me that it's closer to maybe grazing, that it's not an on-off switch, or that that will be periodically reviewed, and perhaps grazing won't be allowed. So, I think you've really lost me on what the government's position is going forward. Sure, Your Honor. Let me try to explain. So, the range of alternatives studied, it's an effort to study different environmental impacts, the impacts of grazing. But in terms of what the choice is of the decision-maker here, the decision-maker has discretion in cases like Half Moon Bay to choose an alternative that's within the range. So, even though impacts have been studied based on no pastures authorized for grazing, the decision-maker still can select some sort of middle-ground alternative. Right. It seems to me- Go right ahead. Like you're telling these homeowners, trust us. We'll come to an adequate solution, just trust us. And so, Your Honor, the Forest Service has a multiple-use mandate. Counsel, isn't the answer to that question yes, or am I really missing something? In terms of trust us in terms of grazing being adequate, yes. Trust us that this carefully limited grazing authorization will protect resource conditions. It's an authorization for roughly 500 head of cattle across 50,000 acres of land, and it's carefully limited based on these utilization thresholds. Utilization threshold is the amount of forage that the cows can actually consume before they're moved to other pastures. And it's a blight to moderate rate of grazing around the 40% mark. So, this is- If we send this back to the district court with instructions to send it back to the agency, what's your best guess based on your experience of how long that will take? I think any errors here can be quickly resolved by the Forest Service. How long have you been doing this? As an attorney, Your Honor? Yes. This is my third year of practice. Okay. So, you've seen a lot of these cases. I have, and I've- Do you think that this could be done within a year? So, in the event that the court were to, in some form- You heard my lead-in hypothetical. Yes. Assume we haven't decided, but assume the panel says, we got to send this back. An alternative of no grazing or full-on grazing is not good enough. We send it back. How long do you think the process will take to come up with a new EA? I think a process to create a new EA would take less than a year, Your Honor. Okay. And in the meantime, the property owners are uncertain about the nature of their property. They have full-on property rights to the land, right? That they occupy, right? They have rights on their private property, which are in holdings within the forest. Yes. And as long as this dispute is pending, they don't know what the value of their land is. If they sell their property to a willing and able buyer, they have to disclose all of this. There might be cows in their front yard, sheep in their backyard. True, Your Honor, but I want to caution the court that, you know, reliance interests as a district court held are usually not cognizable under NEDA. And, you know, the Forest Service has designated all of these pastures as suitable for grazing under a publicly noticed document, the 1985 Forest Plan. How many votes would be wrong for this case to go to mediation and the parties come to an understanding about exactly what kind of grazing will or will not be allowed and resolve it within the confines of this litigation? What's wrong with that? There's nothing wrong with that, Your Honor, so long as the Forest Service is able to service multiple use mandate of balancing these different uses of the public lands. You've heard counsel representing NEDS, the homeowners, and they understand that they're not going to be able to completely stop grazing, which has been going on forever. But why not sit down and talk about it with a neutral party, like one of our mediation officers or another judge of this court to resolve it? Certainly, Your Honor, and we don't oppose further mediation so long as, you know, our position is we want to continue to work towards our multiple use mandate as, you know, directed by Congress. We have a mandate here to balance these multiple uses between recreation users, between grazing, between natural resources, and that balance is what is reflected in this grazing authorization here. When we look at impacts to subdivisions, Your Honor, I think it's important to look at both context and intensity under the NEPA regulations. And the context here is that these subdivisions are included in an allotment that is 11,000 acres of land. And as you said, in adjoining pastures, grazing has been practiced for more than a century. There are numerous inholdings within the Bar X. It's not just these subdivisions. In the Tonto National Forest as a whole, there are 350 inholdings, the majority of which are within active grazing allotments. And the expectation in the forest, in this area of the country, is that if a property owner does not want cattle on their property, that they should fence out their private property. And that's the context we're working here when we look at the impacts of this action. There's another interested, if you will, stakeholder. I know they're not a party to this lawsuit. And that's the cattle herders, sheep marshallers, who apparently they're the ones who've asked for the permit. They are, Your Honor. And their interests are at stake. And the longer the dispute goes on, the more difficult it is for them to determine when to buy herds and how many and where to keep them. It's very true, Your Honor. It's a good point. And that's partially why the district court denied Plaintiff's motion for preliminary injunction for the 2021 grazing season, because of disruptive consequences on permittee here. What is the status quo? We sit here today. The status quo is that the great grazing has continued in the bar, in the bar exit on the Colcord Turkey pasture. There is grazing authorized on this Colcord Turkey pasture through the AOIs in 2021. Partly in this 2022 grazing season, because of the rotation of grazing, there was no grazing done on Colcord Turkey. My client advises me that during 2021, there were no complaints as a result of the grazing that occurred on the 2021, excuse me, on the Colcord Turkey pasture. Maybe there's one complaint, but other than that, the grazing went through without any major issues. Can you talk about the math error? Because it does seem to me that you've acknowledged that there's an error, right? Certainly, Your Honor. It's expressed two different ways. The AOMs expressed two different ways. So what about that? Certainly, Your Honor. And let me take you through what the Forest Service did, leading all the way up to the AOM versus cattle issue that Plaintiff has raised here. So before even constructing the EA, the Forest Service conducted a capacity analysis. That capacity analysis measured the carrying capacity for cattle on different pastures through the range. This is an underlying data model based on forage production data. I think it's covered pretty well in the briefing, but I'm, I'm willing. Oh, I'm sorry. It's your time. It's your time. Sorry, Your Honor. No, I'll move right ahead. So the EA, based on that capacity analysis, in conjunction with utilization, condition, and trend data, creates a maximum authorization for grazing, the 552 cattle number. Now, the Forest Service converted that number into animal unit months, because sometimes grazing is measured in a whole number of cattle, and sometimes it's measured in animal unit months. And it converted using this 1.32 conversion factor. That's the source of the error. Sometimes it's expressed that way, sometimes it doesn't express it that way. That's the problem, right? So, Your Honor, the 1.32 conversion factor is, is an error. It's actually from something called head month, which is a billing number. And there's been confusion throughout the years with the Forest Service on the difference in these conversion factors. The correct conversion factor here is one. One animal unit is, is a cow with a calf. And it says that right in the EA. Well, it says it a couple of different ways. That's the problem, right? Certainly are. So, the comments... At one point, in year 196, in consecutive sentences, it gets it wrong. I'm not suggesting that we don't get stuff wrong too. Sometimes we do. I'm not expecting perfection. But it does come back to the problem we've got. I think that by one read of these numbers, the calculations are such that the amount of grazing authorized exceeds the capacity assessment. So, since we're talking about hoping that homeowners, landowners are going to trust the Forest Service, this is a problem. So, the public and the decision-maker, we argue, is adequately informed of the environmental impacts based on that whole number of cattle. And I want to address... Before you skip over that, why is that? If it's expressed two different ways, why is the public adequately informed here, please? It wasn't just in the EA. It was also expressed in the term permit in 2019, as well as the 2020 and 2021 AOIs. But I want to get back to those... Wait, wait, no, no, no. What do you mean? I really don't understand. It's expressed two different ways, and that's adequate because why? Because the follow-on permits, the term permit based on the EA, is expressed in whole number of cow-calf pairs, as well as the annual operating instructions in 2020 and 2021 are expressed in terms of whole number of cattle-cow-calf pairs. So, the Forest Service consistently used the cattle number, the whole cattle number in the EA in these follow-on documents as well. So, just to back... If I'm a member of the public and looking at this, and that's what NEPA is about. I'm trying to figure out how the calculations were done. Is it the government's denying... And I appreciate your candor that it was expressed two different ways. Is it that it was more frequently and more recently expressed as 1.32? Or is it... What am I missing here? It was more frequently expressed as the whole number of cattle. The 1.32 is just a... It's a conversion factor. And it's in our EA responses to comments because we explain our calculation to from whole cattle to AUM. We explain that we use 1.32. But in the district court, we explain transcript pages 42 to 43. And in our brief, we explain that the 1.32 conversion factor is an error. And we know that because at 2ER57, note eight in the EA, we define an animal unit as one, not 1.32. This is, quote, the animal unit is defined as one mature thousand-pound cow and her suckling calf. And those representations are made at what point in the process? In the district court? In the transcripts. And it's the summary judgment hearing in the district court, transcript pages 42 to 43. Yeah, but you're not suggesting that the government complies with its neat obligations by... No, I'm not. Winding up in litigation and... No, I'm certainly not, Your Honor, just in terms of our consistency that this is a harmless error argument. That's all that transcript references. Okay. If we decide that it's not a harmless error or that the public was entitled to this and that's what NEPA is about and this needs to be fixed, how long does it take to go? Was that your answer to Taukens' earlier question that you think this could be rectified if you went back and had to work this out? They've pointed out a couple of other errors, I think. And harmless is a different question. But is the answer to your question that, I mean, answer to the question about how long that would take to correct this, is that a year? It's even less than a year, Your Honor. It's just a simple conversion mistake in terms of using this 1.32 number to get to AUMs. Well, when they use these numbers, you appreciate this from the briefing. When they use these numbers, they think that this authorizes an amount of grazing that is not consistent with what the capacity yield is. And that's wrong, Your Honor, because the 1.32 conversion factor, which we're conceding now, is wrong and is backed up in the EA. Plaintiff is arguing that that 1.32 factor, which we've identified, it's a billing term that should not be used for grazing authorizations, should be plugged back into our underlying capacity analysis model, the model that I began this discussion with, Your Honor. So there's some measure of technical and scientific expertise that the service has in constructing its underlying models here, the capacity analysis. Plaintiff is saying this erroneous number that the Forest Service is now conceding was error. That 1.32 factor should be plugged into all of the underlying data models that the Forest Service did and rework all of the authorizations for cattle. Your opponent argues that the EA authorizes 30% more grazing than is supported by the Forest Service grazing capacity analysis. What's your response to that? We did not authorize 30% more. We authorized the correct whole number of cattle in the EA as our maximum grazing authorization. And that is what is used in conjunction with the solely because they're taking this erroneous 1.32 conversion factor and plugging it into our underlying capacity analysis model. In terms of possible other errors that Plaintiff has raised, we did briefly discuss the management history section of the EA. The management history section is not part of the Forest Service's baseline for resource conditions. The baseline for resource conditions is based on up to 12 years of reading the range data collected in conjunction with University of Arizona Extension. The management history section is just in the EA to give reference to the fact that grazing authorizations might increase. So there was a slight overestimate in that management history section of prior grazing use, but it's not part of the baseline. It was not part of our max authorization. And the purpose is still served for the public and for the decision maker, because they know that grazing may authorize based on this authorization. Unless the panel has any questions, Your Honor, for these reasons, the judgment of the district court should be affirmed. We'll hear from opposing counsel. So you have a couple of minutes left for rebuttal. Thank you, Judge Christin. And let me lead off with this issue of the grazing capacity analysis and the number of cattle authorized. There's three places in the EA where 1.32 is mentioned. There's two responses to comments, pages 190 and 196 of the second excerpts of record. And even in the EA itself, on page 26 of the second volume of the excerpts of record, the Forest Service equates 3707 cow-calf pairs to a certain number of... Sorry, they basically implied it's 1.32 if you look at the AUMs they list and then the number of cow-calf pairs. So I'm not sure how the public is supposed to understand that this is a mistake, given that it's used three times in the EA. I think from a NEPA perspective, it's a huge problem that they have these two different factors that are floating around that they're apparently using one sometimes and one the other. I think it's also, even putting NEPA aside, it's a problem because the final legal documents, the allotment management plan, the term grazing permit, end up having a number of cattle in there that are not consistent with the grazing capacity analysis. Now, if 1.32 is an error, if they should have used 1.0, I'm not sure where the public or the decision maker is supposed to glean that from the EA itself and from the responses to comments where twice the agency said this is the proper factor. And it's not a minor thing, it's 30%. And it comes down to how much forage does a cow-calf pair consume? Is it one AUM or is it 1.32 AUMs? That sounds like a small thing, but it's a huge 30% problem. The other thing I wanted to say is about the alternatives issue. So the real difference here is that it's true that under the adaptive management scheme, they could decide in any year, let's not graze this area, but they don't have to go through any further process. This is the key decision point. This is the key NEPA decision point where they're deciding, is this pasture going to be available for grazing or is it not going to be available for grazing? And given that this is the key decision point, they should have looked at two alternatives that presented that question, that crystallized that question for the agency and gave them a meaningful choice. And if there are no further questions, I'm done. I don't think there are any further questions. I want to thank you both for your really helpful briefing and candid responses to our questions. And as I said, Judge Graber will participate when we conference the case. We'll stand and recess. Thank you.
judges: HAWKINS, GRABER, CHRISTEN